ADDIE FIKE, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

No. 18,356.

SYLLABUS BY THE COURT.

1. DEATH — *At Street Crossing — Evidence—Negligence—Contributory Negligence.* The plaintiff seeks a recovery for the death of her husband, caused by the negligent operations of a train at a street crossing. The evidence and findings are reviewed, and it is *held,* (1) that there was sufficient evidence to warrant the finding of negligence; (2) that the question of contributory negligence was one of fact for the jury.

2. ———— *Evidence—Habits of Decedent in Crossing Tracks.* The plaintiff was called as a witness by the defendant and testified that her husband was familiar with the crossing, and that she had often been over it with him. On cross-examination she was allowed to testify that he always drove carefully, watching for dangers, and at night stopped to look and listen. It is held that the testimony, if incompetent, was still not prejudicial under the findings.

3. ———— *Instructions—Presumptions that Decedent "Stopped, Looked and Listened."* An instruction was given, stating in substance that in the absence of any evidence on the subject the jury were authorized to presume that from natural instinct to protect his person and preserve his life the deceased looked and listened for approaching trains before venturing upon the crossing, and if his situation was such as to require him to stop, that he did so. In connection with other instructions defining the duty of the deceased to look and listen, and stating the circumstances in which he was required to stop, the foregoing is approved.

Appeal from Harvey district court. Opinion filed July 5, 1913. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*Ezra Branine, Harry W. Hart, William H. Von Der Heiden,* and *Ashton E. Morgan,* all of Newton, for the appellee.

The opinion of the court was delivered by

BENSON, J.: This appeal is from a judgment for damages for the death of the plaintiff's husband at a railroad crossing in Newton.

The railway company has thirteen parallel tracks extending northeast and southwest through the city connecting its local yards. These tracks cross First street, which extends east and west, in a populous part of the city. The direction of the tracks will be referred to as north and south. The traffic of the main line east, west and south out of and into Newton, and the major part of the switching and local work, is over

this crossing, which is in continuous use day and night. The company has long maintained an electric arc light over this crossing to light the crossing and adjacent yards, and to aid the company and the public in the use of the crossing, although not required by ordinance to do so. A switch shanty is located eighty feet south of this light, where a switch tender is on duty day and night. The company maintains extensive shops and a round house near the crossing. On the night of February 20, 1911, at about 8:45 o'clock, Dr. Fike came into the city from the west, driving a two-horse team with a covered carriage. The night was cold and very dark, sleet was falling and a strong wind was blowing. He had on a fur overcoat with collar turned up about his neck and ears, and the side curtains of the carriage were on. The arc light referred to was not burning, having been out for an hour and forty-five minutes. It had been burning irregularly for over a week. There was no light at this crossing except such as might have been afforded by headlights and the lanterns of employees. A switch engine was moving backward, pushing seven freight cars from the north yard to the south yard. At a point 1400 feet north of the crossing the engineer sounded four blasts of the whistle for the switch tender referred to to line up a switch there. The switch tender carrying his lantern from the shanty turned the switch and gave the back up signal, which was repeated to the engineer by a switchman standing on the top of the south car of the train, by a circular motion of his lantern. This signal was answered by two short blasts of the whistle. The engine was then 700 feet from the crossing. It carried a headlight upon each end, but the end of a box car coupled to the engine was immediately in front of the headlight on the south end. The brakeman was facing in the direction of the moving train and wore a heavy storm coat. Dr. Fike, driving east on First street, crossed nine tracks and approached the next one with his team trotting; when

he was within fifteen feet of the track, and the south car of the train was seventy feet from the street crossing, the switchman standing on the south car, to use his own language, "Saw the outlines of a double-horse team and buggy, that is, I got a glimpse of it ahead." He immediately gave the stop signal, and yelled, and then heard and felt a collision. The engineer made all possible effort to stop the train but it ran on 300 feet beyond the crossing. It struck the carriage and killed the occupant. The switch tender at the side of the track also saw the horses' heads for a moment when they were 130 feet from him and about fifteen feet from the track upon which the collision occurred. He shouted and waved a stop signal with his lantern. The south car was then about fifty feet from the point of the collision, and the train was running at a speed of fifteen to twenty miles an hour. The bell was ringing all the time. Bells upon other engines at and about the round house and up and down the yards were ringing and whistles were being blown at all hours of the day and night, and there were lights about the shops and roundhouse north and east of the point of the collision.

In answer to special questions the jury found the following additional facts: The hearing of the deceased was not obstructed by the manner in which his coat was buttoned about his neck and ears; the curtains of the buggy interfered with his seeing approaching objects at the side; it was more difficult to see approaching cars on account of the darkness; aside from the darkness a person in First street could have an unobstructed view of nine tracks northeasterly for a distance of a block and a half; there were no obstructions to the view between the point of the accident and 90 feet west thereof for 600 feet northeastwardly; the deceased had been familiar with the crossing for five years; there was nothing to prevent him from seeing that the electric light was not burning; switch No. 7 (the one turned for this train) was 155 feet from the

Fike v. Railway Co.

point of collision; a person standing on First street just west of the nine tracks would not have a side view of a train as it approached First street from the electric light plant (which is 1400 feet north) ; a lighted lantern such as the switchman had could be seen by a person for half a mile looking toward it who had an unobstructed view, and the train was 400 feet north of First street when the switchman swung it as a signal for the train to proceed. Further findings were that the defendant's employees were negligent in failing "to maintain lights in condition at crossings or to provide watchman for such crossing when lights are not in condition, and to display light at west end of train," which negligence consisted in the "absence of light or watchman at crossing and light at west end of train."

The jury further found that if the speed of the team was checked the evidence did not disclose how far this occurred from the point of collision, nor when it occurred, nor whether Dr. Fike took any precautions to learn of the approaching train, and did not disclose how far he was from the place of injury when he did so, nor what precautions he took before undertaking to cross the track when he was injured; nor how far the reflection of a headlight on the west (south) end of the engine could be seen by one standing at or near the crossing, nor whether a headlight so placed next to box cars would throw a light visible that night to one standing in First street west of the nine tracks while the engine was moving between First street and a point 800 feet north; nor how far Dr. Fike could have seen the train just as he drove upon the track, but in the opinion of the jury not to exceed forty feet. To the question whether Dr. Fike stopped his team to look and listen for cars approaching First street from the northeast before undertaking to cross the track the jury answered, "Yes, in the absence of evidence the law presumes he did." Other questions were answered, but

the statement of facts first given includes the answers so far as material.

The negligence charged in the petition was that the train was backed upon the crossing at dangerous and unreasonable speed without a crossing signal, flagman or watchman, or other measures to guard against accident with the electric light out and in the darkness.

The defendant argues that the charges of negligence are not proven, and that the death of the plaintiff's husband was caused by his own negligence.

The crossing was a dangerous one. Thirteen tracks crossed the street, with railroad yards, shops and roundhouse near by and the constant switching and moving of cars incident to this important division point. The jury were warranted in finding that ordinary and reasonable care at such a place required that in the absence of the arc light a light ought to have been displayed at the end of the backing train, or a watchman provided. Running such a train over the crossing on a dark, stormy night in the circumstances stated, without warning or signals except the ringing of the bell, and the sounding of the whistle for switching, with no light except that of the lantern of the switchman and such as might shine out from the headlight between the tender and the solid end of the box car in front of it, is evidence from which negligence might be found.

It is argued that the arc light had but recently gone out. If sufficient time had not elapsed to repair or refurnish it there was at least sufficient time to take some further precautions in switching cars until it could be restored. The fact that the city had not required a light or a watchman does not relieve the defendant from the duty to exercise such ordinary care and provide such safeguards as common prudence would dictate in view of the dangers to be reasonably apprehended. (*Mo. Pac. Rly. Co. v. Moffatt,* 56 Kan. 667, 44 Pac. 607; 2 Thompson's Commentaries on the Law of Negligence, §§ 1525-1535; 3 Elliott on Rail-

roads, 2d ed., § 1156; *English v. Southern Pacific Co.*, 13 Utah, 407, 57 Am. St. Rep. 772, and note; *Henavie v. N. Y. C. & H. R. Rld. Co.*, 166 N. Y. 280, 59 N. E. 901, 9 Am. Neg. Rep. 345.)

In *Railway Co. v. Durand*, 65 Kan. 380, 387, 388, 69 Pac. 356, the following quotations from *McGrath v. N. Y. C. & H. R. R. R. Co.*, 63 N. Y. 522, appear:

"Where there has been a collision at a railroad crossing with a traveler upon the highway, and the railroad company is sued for negligence in causing the collision, its negligence is made out generally by proving all the circumstances surrounding the transaction, and submitting them with proper instructions to the jury. It may be proved that the collision took place in the night time, in a rain-storm; that the train was running fast or slow, with or without headlights; that it was backing or going forward; that it was running in a city in a crowded thoroughfare, or in the country; that there were many or few tracks; that there were obstructions, making it impossible to see the train before the crossing was reached. These circumstances are proved, not to impose upon the railroad company any duty which the law does not impose, or any duty to do any acts collateral to the running and management of its trains in a lawful manner upon its road, but as bearing upon the question of the manner in which it has run and managed its train. A different degree of care may be required in running trains in the dark and in the daylight, in city and country, when there are obstructions and no obstructions near crossings. . . . And, in the absence of flagman, railroad companies may, in the exercise of proper care, be required to run their trains slower, or to take other precautions to protect travelers; the question in all cases being, not whether it was their duty to do any of the collateral things to warn travelers, but whether, under all the circumstances of the case, it run and managed its train with the requisite care and prudence." (pp. 527, 528.)

It has been declared negligent to run a train over a public crossing at night without a headlight, or if the engine is not in front then upon the end of the forward

car.   (33 Cyc. 958; *L. E. & W. Ry. Co. v. Zoffinger,*
107 Ill. 199.)

(See, also, *Burling v. Railroad Co.,* 85 Ill. 18, and
*B. & O. S. W. Ry. Co. v. Alsop,* 176 Ill. 471, 52 N. E.
732.)

It is contended, however, that the dangerous char-
acter of the crossing was well known to the deceased,
who was familiar with the situation, knew of the ab-
sence of the light, and that a watchman had not been
provided, and should have exercised care commensurate
with the known danger.   But it was a question for the
jury whether he did exercise reasonable care, and their
finding, if supported by competent evidence and ap-
proved by the trial court, determines the fact.   It is ar-
gued that it was negligence *per se* to approach the track
where he was killed with his team on a trot, with the
sides of his carriage on and his fur coat collar turned
up.   While the side curtains would obstruct a view
directly to the side, the tracks crossed the street
diagonally.   Whether he leaned forward and looked in
the direction of the tracks is not shown, but the pre-
sumption is that he did all that a reasonably prudent
person would have done with his knowledge of the
situation, unless there is evidence tending to show that
he did not.   While there is evidence that he approached
the track where he was killed with his team trotting,
it must be remembered that he had already crossed
nine other tracks; whether he stopped before going
upon the first one, or afterward, before the team was
seen by the switchman is not shown, but as the jury
said, it is presumed that he did, that is, it is presumed
that he exercised the care of an ordinarily prudent
person unless there is evidence to the contrary.   In view
of other movements and other lights on or about the
tracks it might have appeared to him that to stop
after crossing one or more of the tracks would only
increase the peril.   He had the right to use the crossing,
exercising ordinary care in doing so, to be determined

by the jury, not from one but from all the circumstances. It is said that he should have observed the light of the lantern of the switchman on the moving car, but there were other lights. The train had just been deflected from another track, and he might not have been able to determine with certainty that it was advancing on that particular track. The train was moving rapidly, affording but little time for observation and reflection after he had gone upon the first track. Besides, the switchman, enveloped in a heavy coat, held the lantern in his left hand as he faced south, and its light may have been partially obscured except at the moment in which the lantern was used as a signal. The deceased was bound to look ahead as well as along the tracks in the directions from which a train might approach so far as he could reasonably do so. In all these circumstances it was a question for the jury, upon all the evidence, whether he acted with ordinary prudence. (*Johnson v. Railroad Co.,* 80 Kan. 456, 460, 103 Pac. 90; *Railway Co. v. Wilkie,* 77 Kan. 791, 90 Pac. 775, 11 L. R. A., n. s., 963.)

The defendant called the plaintiff as a witness, who testified that her husband frequently drove over the crossing in question and was familiar with it. On cross-examination she was permitted to testify over the defendant's objection, that he always drove carefully, watching for dangers, and at night stopped to look for trains. This objection is now presented as a ground of error, citing *Coal Co. v. Dickson,* 55 Kan. 62, 39 Pac. 691. The objection made was that the testimony was incompetent, a conclusion, and that the subject was not one for expert evidence. It was a statement of what the witness had observed. The statement that Doctor Fike was careful in driving and watching on the occasions referred to in her direct testimony was not the expression of a general opinion that he was a careful driver. Evidence of this char-

acter is referred to as having probative force in *Railway Co. v. Moffat*, 60 Kan. 113, 117, 35 Pac. 837, but whether it was admitted with or without objection is not stated.

In *S. K. Rly. Co. v. Robbins*, 43 Kan. 145, 23 Pac. 113, an action to recover damages for the death of a brakeman, where the question whether the opinion of an expert was admissible was considered, the court said:

"There were eye-witnesses present, who at the trial described the manner in which he ascended the ladder, and the care which he exercised at the time the accident occurred; and hence there was no necessity nor propriety in admitting the opinion of an expert as to whether he was generally a careful and skillful man." (p. 148.)

The eyewitness here only had a momentary glimpse of the team and carriage. No one observed the conduct of the deceased before that moment which immediately preceded the fatal collision.

It was said in *Frederickson v. Iowa Cent. Ry. Co.*, (Iowa, 1912) 135 N. W. 12:

"But we are of the opinion that evidence of the general habit in using a particular railroad crossing is competent, at least where there are no eyewitnesses of the accident. It may tend to aid the presumption of self-preservation that arises in such cases, because a person is more likely to do what he is in the habit of doing under the same conditions." (p. 13.)

Other cases appear to hold that when there are no eyewitnesses of the occurrence the exercise of care by the deceased in such cases may be shown by his habit. (*C. & A. Ry. Co. v. Wilson*, 225 Ill. 50, 80 N. E. 56; *Tucker v. Railroad*, 73 N. H. 132, 59 Atl. 943.)

In *Zucker v. Whitridge*, 205 N. Y. 50, 93 N. E. 209, the court, after reviewing conflicting decisions upon the

Fike v. Railway Co.

question, disapproved evidence of general conduct of the injured person in such a case, but said:

"We are not now called upon to decide whether evidence of the habits of a decedent in crossing railroads is competent when there is no eyewitness of the event." (p. 65.)

This subject was referred to but not decided in *Saunders v. Railway Co.*, 86 Kan. 56, 61, 119 Pac. 552, and it is not necessary to decide it here for the testimony if incompetent was still not prejudicial. The jury in answering the question whether the deceased stopped his team to look and listen based their affirmative answer on the legal presumption and not on the testimony.

Complaint is made of an instruction stating in substance that in the absence of evidence whether the deceased did look and listen the law presumes from natural instinct to protect his person and preserve life that he looked and listened for approaching trains before venturing upon the crossing, and if his situation was such that his duty was to stop the law presumes that he did stop. The principal objection is that there was no room for the presumption because there was evidence to the contrary. Reference has already been made to the evidence touching that matter. This objection is based apparently upon the supposition that the instruction related to the particular track, but it related to the crossing, and properly so.

Another criticism of the instruction is that it was not qualified by stating that the presumption would not apply if there was evidence that the accident would not have occurred if the deceased had exercised due care. The introductory phrase referring to the absence of evidence upon the subject contained the qualification suggested. Other instructions correctly stated his duty to look and listen and the circumstances in which he was required to stop. No error is found in the instructions.

The motion for judgment on the findings is based largely upon the claim that they established contributory negligence. This contention has already been considered.

The judgment is affirmed.