No. 20,578.

AGNES DEISTER, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. RAILROADS—*Negligence—Death at Street Crossing—Insufficient Warnings of Approaching Train.* A work train came into a station in the dusk of evening on a main line track, took a spur track, and passed over a sidewalk leading to the depot, which was near the crossing. At the front of the train were three flat cars. Next came the caboose, with its red lights showing in front. The engine was at the rear of the train, which was 400 feet long. The spur track curved sharply around an embankment to the crossing, and the sidewalk came down one side of the embankment to the crossing. The embankment prevented persons on the sidewalk from seeing flat cars on the curve until within six or eight feet of the track. A pedestrian ran down the walk on his way to the station, hesitated a moment when a few feet from the track, went on, and was killed by the leading flat car, which came from behind the bank at a speed of ten miles per hour. There was no light on the forward end of the leading car, or other light visible, except the red lights on the caboose. The air whistle on the forward end of the leading car was not sounded, and because of the light conditions, the deceased could not see the flat cars when he arrived at the track.

   It is held, the jury were warranted in finding that warnings such as the engine whistle, sounded when the train was at the outskirts of town, the engine bell, ringing when the engine was around the curve and 600 feet away, an automatic crossing bell ringing at the main line track 150 feet away, and noise of the train, were not sufficient, and that a white light should have been displayed at the forward end of the leading car, and the air whistle should have been sounded.

2. SAME—*Contributory Negligence—Evidence—Findings.* The subject of the contributory negligence of the deceased was properly submitted

to the jury, and the material findings of fact returned by the jury were sustained by the evidence.

3. SAME—*Negligence—Trains Approaching Street Crossings—Caution Required of Trainmen—Evidence—Rules of Railway Company.* Rules of a railway company governing the conduct of its employees in the operation of trains, relating to matters affecting the safety of the public, such as the giving of signals and the displaying of lights, are some evidence of the measure of caution which ought to be exhibited in situations to which the rules apply.

Appeal from Harvey district court; FRANK F. PRIGG, judge. Opinion filed January 6, 1917. Affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley,* all of Topeka, for the appellant.

*Ezra Branine,* and *Harry W. Hart,* both of Newton, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages resulting from the death of a pedestrian who was overtaken by one of the defendant's trains on a sidewalk crossing. The plaintiff prevailed and the defendant appeals.

The accident occurred in the dusk of evening, on November 27, 1914, in the city of Melvern. The defendant's station is reached by Emporia avenue. Emporia avenue extends from west to east, and the sidewalk on the south side of the street crosses a spur track, extends along the north side of the depot, which is east of the spur track crossing, and then crosses the main-line track east of the depot. The station grounds are below the general level of the ground to the south and west. The main-line track approaches the depot from the southwest, in a deep cut. The spur track leaves the main-line track some 350 or 400 feet from Emporia avenue, curves sharply around an embankment, and at the point of intersection with the sidewalk, crosses it from south to north. From the intersection the sidewalk rises toward the west a distance of from 75 to 100 feet, until it reaches the general level. If a person go down the incline toward the track, the bank on his right rises higher and higher, until at a short distance from the track it is higher than a man's head—probably eight feet high. Along the track

the bank has a slope of ten or twelve feet from the bottom to the top, and the foot of the bank is from four to six feet from the west rail. A person coming down the sidewalk in daylight can see the upper part of a caboose or an engine on the curve, but can not see flat cars until quite near the track. On the evening of the accident a work train came into the station on the main-line track, and the purpose was to stop a short distance north of Emporia avenue on the spur track. At the front of the train were three flat cars. Next came the caboose, with its red lights showing in front. Following the caboose were a coach, two dump cars and a ditcher. The engine was at the rear. The train was about 400 feet long. The plaintiff's husband came rapidly down the sidewalk, hesitated a moment at a point near the track, went on, and disappeared under the front flat car, which came from behind the bank at a speed of ten miles per hour.

The charges of negligence contained in the petition and submitted to the jury were that the train was improperly made up, because of the position of the caboose and the fact that the red lights of the caboose indicated the end of the train; that the rate of speed was excessive; that the front of the train was without a light; and that no signals of the approach of the train were given. With a general verdict for the plaintiff the jury returned the following special findings of fact:

"Q. 1. Before the said Walter Jacob Deister undertook to cross defendant's railway track at the time and place in question, then—

"Did he stop? A. Yes.

"Did he look for approaching trains? A. Yes.

"Q. 2. If you answer the last foregoing question to the effect that said Deister stopped, looked or listened before he started across the track, then state how far from the approaching flat cars he was,—

"At the time he stopped? A. About 8 feet.

"At the time he looked? A. About 8 feet.

"At the time he listened? A. About 8 feet.

"Q. 3. What, if anything, would have prevented Deister from hearing the approaching train in time to have avoided the collision, if he had taken the precaution to listen for the same just before he started across the track? A. Nothing.

"Q. 4. State the rate of speed at which the train was moving at the time of the collision with the said Deister. A. About 10 miles.

"Q. 5. What, if anything, would have prevented the said Deister from

seeing the approaching train in time to have avoided the collision if he had taken the precaution to look for the same just before he started to cross the track?  A.  Darkness, shadow of the bank, deceptive red lights on caboose.

"Q. 6.  For how far could the said Deister have seen the approaching flat cars if he had taken the pains to look for them when he got within five or six feet of the track?  A.  Couldn't see them for reasons given in Q. 5.

"Q. 7.  How far could he have heard the approaching train if he had attentively listened for its approach when he got within five or six feet of the track?  A.  About 200 feet.

"Q. 8.  What effort, if any, did Deister make to avoid being struck by the cars after he saw the approaching train?  A.  Hurried to cross tracks to avoid way car with red lights.

"Q. 9.  How far was the nearest flat car from the crossing in question when Deister first saw it approaching?  A.  Never saw flat car.

"Q. 10.  What could have been done that was not done by those in charge of the train in question, to avoid the collision with Deister, after it became apparent that he intended to cross the track without waiting for the train to stop?  A.  Display white light and sound air whistle on front end of leading flat car.

"Q. 11.  With reference to any signals of the approach of the train in question, please answer the following:

"1.  How far from the crossing in question was the train when the engine bell was ringing (if it was ringing at all)?  A.  Leading car 200 feet from crossing.

"2.  State approximately how often, if at all, the air whistle on the flat car was sounded while approaching the station before the collision. A.  Air whistle was not blown.

"3.  Was the automatic crossing bell ringing as the train approached Emporia Avenue where deceased was killed?  A.  Yes.

"Q. 12.  If Deister hesitated or paused before he undertook to go across the track, then what did he do thereafter to avoid being struck by the approaching cars, if anything?  A.  Hurried to avoid way car with red lights.

"Q. 13.  If Deister paused before attempting to cross the track, how far was he from the flat cars when he did so?  A.  About 8 feet.

"Q. 13½  Was the whistle on the engine blown at the signal post as the train came to Melvern?  A.  Yes.

"Q. 14.  When Deister was 75 to 150 feet from the crossing on the sidewalk, how far off could he have seen the caboose and engine of the approaching train (if at all)?  A.  About 200 feet (if at all).

"Q 15.  When Deister got within 8 or 9 feet of the crossing on the sidewalk, how far could he have seen the approaching flat cars to the southwest?  A.  Not at all."

Motions for judgment for the defendant on the special find-

ings and for a new trial were overruled, and judgment was entered according to the general verdict.

The defendant argues that it was not guilty of any negligence, because the deceased was fully warned of the approach of the train. The whistle was sounded for the station. The automatic bell at the intersection of Emporia avenue and the main-line track was ringing. The engine bell was ringing when the leading car of the train was 200 feet from the sidewalk. The deceased could have heard the train for a distance of 200 feet, had he listened when within five or six feet of the track. So, it is said, he was abundantly warned.

In cases like this the purpose of a warning is to give admonition of approaching danger. The warning should be of such character as the peculiar circumstances of the particular situation suggest, and it should be reasonably sufficient to accomplish the purpose for which it is intended. The station whistle, sounded when the train was at the outskirts of town and the deceased was somewhere about town, bore no relation to the peculiar peril incident to crossing the spur track when the deceased reached it. The automatic bell was at the main-line track beyond the depot, about 150 feet away. The engine bell was around the curve behind the bank and 600 feet away. These were little more than general warnings to a person coming down the sidewalk, like the spur track itself, the depot, and other station characteristics, that he was about to go where railroad work was accomplished by the operation of trains, and that he might expect to encounter moving cars. The noise of the train, as it came around the curving bank, could be heard for a distance of 200 feet, and the train and the deceased were in close proximity when the deceased went on the track. Perhaps this noise, and certainly the spur track itself, admonished the deceased that a train might be approaching on the very track he was about to cross, and to look for one. The jury finds plainly enough that he saw the train. He could not, however, see the portion of the train which made it dangerous for him to attempt to cross the track. Looking in the direction from which the train was coming he saw the caboose with its red lights. The flat cars were forty-foot cars, and there were three of them. The caboose was 120 feet away.

34—99 KAN.

Everybody knows what a red light indicates. Displayed at one side of a street, it indicates danger at that point, on that side of the street, and not somewhere else. Displayed on an automobile, it warns persons approaching from the rear, of the locality of the rear of the car. Displayed on a caboose, it indicates the rear of the caboose, and it is the common mark of the rear end of an incoming or outgoing train. These are matters of common practice and common knowledge. Trains at stations go backward as well as forward, and the deceased was fairly warned of a train 120 feet away, which might be moving toward him. Although a pedestrian should not race with a train, and assumes all the risk should he do so, the deceased could have crossed in safety if the caboose had been the nearest car. The defendant created the situation, and the question is whether or not ordinary prudence required it to give warning that it was sending an invisible instrument of death 120 feet in advance of what appeared to be the end of the train. The answer is obvious.

The jury's answer to question No. 10 is not responsive to the question. The court is satisfied the answer was returned through inadvertence and not through perverseness. By the answer the jury undertook to point out what could have been done in advance to avoid the collision, instead of what could have been done to avert it after the collision became imminent. The answer, therefore, discloses the jury's view of what omissions constituted negligence on the part of the defendant's employees. The air whistle should have been sounded on the curve as an alarm, and a white light should have been displayed to disclose the proximity of the leading car and indicate its approach. As this court remarked in the case of *Fike v. Railway Co.* 90 Kan. 409, 415, 133 Pac. 871, where authorities were cited, it has been declared to be negligence as a matter of law to run a train over a public crossing at night without a headlight, or if the engine is not in front, then a light at the front of the forward car. The crossing was a public street crossing. Besides this, the evidence was sufficient to show that the defendant had reason to anticipate the presence of persons at the crossing at the time the train arrived. Assuming it to be true that the flat cars were indistinguishable in the uncertain light to persons in the situation of the deceased, the declara-

Deister v. Railway Co.

tion of negligence as a matter of law could be made in this case. In any event, the jury's finding of negligence as a matter of fact is well supported. The defendant is not restricted to any particular arrangement of cars in making up its trains, but it ought not to send a train, made up with a series of cars in front which under the circumstances can not be seen, around a curve and over a public street crossing, without giving adequate warning of the approach of the leading car.

The defendant charges the deceased with contributory negligence, as a matter of law. Assuming the material findings of the jury to be true, the question whether or not right of recovery was defeated by contributory negligence on the part of the deceased was properly submitted to the jury for determination. The character and amount of noise made by the train were not described. The evidence does not establish that the leading flat car made such a noise that its presence was manifested although it could not be seen. Granting there was room for the inference that the flat cars were not cognizable by the deceased, and that to his faculties, fairly exercised, the caboose lights marked the end of the train, his hurried movement would have taken him safely beyond the track before the train covered a third of the distance to him.

The defendant insists that the findings of the jury relating to the ability of the deceased to see the leading flat car were not sustained by the evidence. If so, the assumptions just made can not be indulged. Whether or not the deceased was unable to see the flat cars, and was unable to see them for the reasons given in finding number five—darkness, shadow of bank, deceptive red lights on the caboose—is a very serious question, which has given the court much concern.

By the terms "darkness" and "shadow of bank" the jury endeavored to describe light conditions which could not be definitely described by any single word or phrase, or in any except relative terms. Therefore the jury are not to be held rigidly to the literal meaning of the words used. The accident happened at 5:53 in the evening. The sun set at 4:40. The evening was cloudy and the atmosphere was smoky. But there was light enough from the after-glow of the sunken sun that objects could be seen against it, while objects below the top of the bank, and so cut off from the background of light, could not

readily be seen. The evidence discloses that various persons in various positions saw various things at various times. From the report of their observations it might be concluded that at the time of the accident it was quite light, and it might be concluded that the dusky stage between light and darkness was so far advanced that the tinge of blackness strongly prevailed.

John R. Farmer testified as follows:

"When I first saw the train, I was a little south and east of the depot on a little raise on the easterly side of the tracks, and the train was coming around in that east viaduct. The engine was on the west end pushing the train ahead. When I first saw it, the train was probably 125 or 130 feet from me. . . . It was getting dark, pretty dark. You could n't see a flat car very far. There was an embankment right west of the train. It would be difficult to see a flat car in the shadow of that embankment from where I was—it would be pretty dark."

The jury derived the expression "shadow of bank" from this testimony.

Frank Brandeweide was inside the depot when the train came in. He testified as follows:

"I saw the train before it stopped and I saw it stop. I was standing in the southwest window. Looking against the light in the west I could just see the top of the caboose. The embankment was west of the train. I heard the whistle up in the cut and I thought it was the motor and I went to the window and looked. I stood at the window and it backed around the curved track. I never noticed any flat cars.

. . . . . . . . . . . . . . .

"Q. When you went out there where the train had stopped, what did you see? Go ahead and tell the jury what was going on. A. I seen a large crowd of people around there, and I finally worked around where,—it was dark where the body was laying and I couldn't see anything. They were striking matches and I went on back; you couldn't see who it was or anything. When I went out there to the crossing where this body was, I could not see the body because it was so dark.

"Q. Tell the jury, the best you can so they will understand, the degree of darkness, how much of the body you could see, and so on. A. Why, I could see it was a body.

"Q. Was that about all you could see? A. Yes, sir.

. . . . . . . . . . . . . . .

"Q. How far could you see a train if you were looking at it, without anything between you and it, at that time? A. Well, I don't know.

"Q. Take a chance at it. A. Oh, I couldn't say.

"Q. How far was it that you saw it,—how far was it when you were looking through the window and saw it? A. It wasn't as far as from here across the court room.

Deister v. Railway Co.

"Q. It wasn't? A. No, sir.

"Q. You were inside of the depot? A. Yes, sir.

"Q. How much of it could you see through the window? A. I could just see the top part of the caboose.

"Q. That is all you saw of it? A. Yes, sir."

Charles W. Irey saw the accident. He was on the opposite side of Emporia avenue and about half a block west of the track. He testified as follows:

"I was half a block from the track. I suppose it was from 150 to 160 feet. I was going northeast. I saw the train strike him. I did not see the train before it got to the crossing. I saw the markers on the caboose. I did not see any part of the train until the flat cars showed up. I never saw any one on the flat cars. . . . I saw the train just an instant before it struck him. You could see the caboose all the time and the engine. . . . Before the flat cars came out from behind the embankment I could not see them.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Could you see the flat cars at all? A. You could after they came out on the crossing into the street—after they came out from behind the embankment in front of you.

"Q. Before the flat cars got out from behind the embankment ahead of you, could you see them? A. No, sir.

"Q. For what reason? A. On account of the embankment.

"Q. What about the darkness, dusk or darkness at the time of the accident? A. Well, it was dusk. dark dusk.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Suppose you were on the sidewalk within five feet of the track, looking to the southwest, was there anything to have prevented you from seeing an engine or flat cars for three or four hundred, or five hundred, five hundred fifty or six hundred feet? A. Why, I believe so, that caboose with those tail lights on would prevent you from seeing those flat cars.

"Q. If the flat cars were between you and the caboose? A. Yes, sir.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. You said you were acquainted with the situation of the tracks and the sidewalk; now then, tell the jury whether you could see a flat car coming from the southwest when it was ten feet from the crossing and you were six feet from the crossing, from the rail on the sidewalk. A. To my best knowledge you could not.

"Q. You could not? A. No, sir."

Irving Colyar saw the accident. He was an important witness, intelligent, careful of what he said, candid, and fair. He was on the sidewalk on his way to the depot. The deceased passed him and went on down the incline of the sidewalk ahead of him. He testified as follows, a few words being italicized

because of their importance in determining the effect of the "shadow of the bank":

"Q. Where was this he appeared to stop or hesitate?  A. Just this side of the track.

"Q. Where would you say it was with reference to the edge of the embankment?  A. Well, it might have been just as he could have seen up the track—just as he got to the edge of the embankment.  I could not say definitely, I was too far off to tell that.

"Q. Did he hesitate or stop long enough to have looked down the track southward?  A. He may have.  It would not have taken him but just an instant to turn his head.  I did not notice whether he turned his head or not, but he must have been watching the train.

"Q. Where do you think he was with reference to the track when you saw him slow up, or stop?  A. It is hard to tell. *I could not see his feet or the lower part of his body, just his shoulders, from the waist up.* It is pretty hard to tell just exactly where he was.  I think he was just this side of the track a short distance.

"Q. About how far would you say, just a few feet in your judgment?  A. Well, I judge it was a few feet.

"Q. I will ask you to state whether or not you saw or observed these flat cars before they came out into the street.  A. Not until they shot around that bank.  I saw them just as they shot out around that bank.

"Q. You mean about the time they crossed the sidewalk that you were on?  A. Yes, sir.

"Q. Did you know there were any flat cars ahead of the caboose until that time?  A. No, sir.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. He then hesitated, as I understood you to say?  A. Well, yes, sir, he hesitated just as he got to the track, the way it looked to me.

"Q. Could you see the train then?  A. I could not from where I was.

"Q. You could not see the train then?  A. No, sir.

"Q. Did he look toward the train?  A. I could not tell whether he did or not.

"Q. Did he look like he saw the train and then tried to get across?  A. I could not say whether he did or not, he seemed to hesitate, and the next instant he was on the track under the train—they seemed to meet there, and he disappeared there.  That is all I seen of him.

"Q. You could not tell whether he tried to beat the train across or not?  A. I judge he was watching that caboose cupola."

This exemplification of evidence favorable to the plaintiff discloses substantial basis for every element of the fifth finding of fact.  Even if the court should be of the opinion the deceased was not prevented from seeing the car which ran him down because of the things enumerated in the finding, and should be of the opinion the deceased must have seen the car

in time to avoid it, it would constitute an invasion of the province of the jury so to declare. *Ad questionem juris respondent judices; ad questionem facti respondent juratores.* When there is evidence from which an inference in favor of the plaintiff may fairly be drawn it makes no difference that this court may be astonished that the jury drew the inference, or may think the evidence rebutting the inference to be overwhelming.

It is said the first part of the first finding of fact is contrary to all the evidence on the subject. The witnesses who saw the accident agree that the deceased had increased his speed beyond a fast walk, and was running, when he came to a point a short distance from the track. The court is unable to find the testimony of any witness who, when framing his own description of the conduct of the deceased, said he stopped, in the sense of ceasing from all forward motion. Several witnesses said he hesitated for an instant, or hesitated a little. In the course of further examination, the attorney for the plaintiff would weave into his questions the word "stop," as shown in the examination of Irving Colyer, quoted above. The result was testimony which is abstracted as follows:

"When he stopped I don't remember whether he looked at the train or not, but right at the time he was being struck he did.

"Q. Had Deister got clear out from behind the embankment when he stopped? A. Yes, sir.

"Q. When he stopped he looked to the south, or right at the train did he? A. Yes, sir."

It is quite likely the following testimony tells what occurred:

"When he got to the intersection he hesitated a little. He didn't stop still. He looked toward the train. . . .

"Q. When you were interrupted awhile ago, you were saying you saw him stop and look towards the train and then—then what did you see him do, that is Deister? A. When he stopped, he didn't exactly stop; he hesitated and then he started running again."

The dictionary meaning of the word "hesitate" is "to stop or pause respecting decision or action" and technically the finding is supported by the evidence. Certainly the jury can not be accused, under the circumstances, of prejudice or unfairness in

returning the answer, and this being true, the strict truthfulness of the answer is not a matter of importance. The duty to stop before leaving a place of safety arises when stopping is necessary in order to make effective use of the faculties of sight and hearing. The deceased did check his speed sufficiently, and long enough, although but for a moment, to see the train. The visible part of the train was far enough away to make it safe for him to hurry across.

The plaintiff introduced in evidence, over objection, certain rules of the defendant, among which were the following:

"The engine bell must be rung on approaching every public road crossing at grade and until it is passed.

"When cars are pushed by an engine (except when shifting or making up trains in yards), a white light must be displayed on the front of the leading car by night.

"When cars are pushed by an engine (except when shifting and making up trains in yards), a flagman must take a conspicuous position on the front of the leading car and signal the engineman in case of need.

"They will, in rounding all curves where the view is obscured, sound the whistle.

"Night signals · are to be displayed from sunset to sunrise. When weather or other conditions obscure day signals, night signals must be used in addition."

The court instructed the jury as follows:

"The jury are instructed that the observance or non-observance of the rules of the defendant company as to the operation of its trains is not conclusive as to the negligence or care of the defendant company or its employes, but are only circumstances to be taken by the jury for what they may think they are worth in determining whether or not the defendant's employes were negligent in the operation of said train at the time in question."

There is some division of opinion respecting the admissibility of such rules in cases of this character. The clear weight of authority, however, is that they are admissible. (Note, 8 L. R. A., n. s., 1063.)

In section 282 of volume 1 of Wigmore on Evidence the learned author states the following principle:

"The opponent's conduct in taking precautions to prevent an apprehended injury, or to remedy one already inflicted, may sometimes indicate a consciousness of wrong, in respect either to the party's identity as the wrongdoer or to his. culpability in doing the act."

In the corresponding section of volume 5, the supplemental volume, direction is given to add to the original section, as a new paragraph, the following:

"So, too, an employer's general rule of conduct for *employees* may be some evidence against him, on this principle, as an admission of the standard of care required, where the act of his employee in violation of the rule, is charged against the employer as an act of negligence."

The case of *Stevens v. Boston Elevated Railway*, 184 Mass. 476, is cited in support of this text. In the Stevens case it was said:

"So a rule made by a corporation for the guidance of its servants in matters affecting the safety of others is made in the performance of a duty, by a party that is called upon to consider methods, and determine how its buisness shall be conducted. Such a rule, made known to its servants, creates a duty of obedience as between the master and the servant, and disobedience of it by the servant is negligence as between the two. If such disobedience injuriously affects a third person, it is not to be assumed in favor of the master that the negligence was imma-terial to the injured person, and that his rights were not affected by it. Rather ought it to be held an implication that there was a breach of duty towards him, as well as towards the master who prescribed the conduct that he thought necessary or desirable for protection in such cases. Against the proprietor of a business, the methods which he adopts for the protection of others are some evidence of what he thinks necessary or proper to insure their safety." (p. 479.)

The inference to be derived from the promulgation of rules of this character was discussed in the British House of Lords, in the case of *Dublin, Wicklow and Wexford Railway Co. v. Slatterly*, 3 App. Cas. 1155. The lord chancellor, Lord Cairns, said:

"The only negligence alleged against the appellants was that the express train from Dublin did not whistle before, or as it passed through the station, and it was suggested that had it whistled it would have acted as a caution to Slatterly, and he would not have attempted to cross the line; and farther, that, as a person accustomed to the ways of the station, he would expect that a train passing through without stopping would give notice, by a whistle, of its approach. As to the necessity for whistling, Rossiter, the engine-driver, called for the appellants, stated that it was his duty with express trains to whistle passing every station; and although it would, as it seems to me, be difficult to lay down an ab-stract rule as to the necessity of whistling, it may be taken that the orders given to the engine-drivers showed that the appellants considered whistling under the circumstances to be a reasonable and proper pre-caution, and it might have been, and I think it was, right to tell the

jurors that if they found this precaution neglected on this occasion they might consider it to be evidence of negligence on the part of the appellants." (p. 1163.)

### Lord O'Hagan said:

"I do not enter at any length on the question, how far the whistling was a precaution which the defendants were bound to provide for the safety of the public. It seems to me that their own conduct is, on that point, conclusive against them. . . . It is surely enough that, in the particular case, the defendants by their own conduct admitted the propriety of whistling, and accepted the duty of doing so, for the protection of their passengers and the general public. Their servants proved the orders given to whistle, at the various stations, on the passing of the express train; and they are not now to be heard in denial of the necessity of such a practice, when they themselves established it, and led people to rely on its continuance and regularity, to their manifest risk if it should be abandoned without notice, or intermitted through neglect. We were told much of the flaring lights, and the means of warning through the noises of the engines and the rushing of the train; but again the defendants answer their own argument by the fact that, in addition to these things, they practically admitted the need of something more, and taught the public to expect the signs of danger—not through one sense only, but by the ear as well as by the eye, by the whistle as well as by the lamp." (p. 1183.)

### Lord Selborne said:

"The evidence proves that on this line, and at this particular place, such notice was not only reasonably practicable but was usual. The engine-driver of the express train himself stated it to be his duty to whistle in passing every station, and wherever else he might think there was danger; and that he did so whenever he passed a level crossing. Kavanagh, the guard, added that it was the practice whenever an up train was stopping at this particular station to whistle a second time.

"In this state of things, I am of opinion that the judge could not properly have withdrawn from the jury the question . . . whether such omission was negligence on the part of the company, causing the accident." (pp. 1188, 1189.)

### Lord Blackburn said:

"But I think that if the result of the experience of those who have the practicable management of trains is such as to make a particular precaution ordinary and general, it may well be said that a person taking reasonable care would use that precaution." (p. 1212.)

The minority view is stated in the case of *Fonda v. St. Paul City Ry. Co.,* 71 Minn. 438:

"Private rules of a master regulating the conduct of his servants in the management of his own business, although designed for the pro-

Deister v. Railway Co.

tection of others, stand on an entirely different footing from statutes and municipal ordinances designed for the protection of the public. The latter, as far as they go, fix the standard of duty towards those whom they were intended to protect, and a violation of them is negligence in law or *per se*. But a person can not, by the adoption of private rules, fix the standard of his duty to others. That is fixed by law, either statutory or common. Such rules may require more, or they may require less, than the law requires; and whether a certain course of conduct is negligent, or the exercise of reasonable care, must be determined by the standard fixed by law, without regard to any private rules of the party. . . . There are a few cases which support plaintiff's contention, but in none of them is the question considered or discussed at any length, and in some of them no reason whatever is given for the decision. The only reason assigned in any of them why such evidence is admissible is that it is in the nature of an admission by the party promulgating the rule that reasonable care required the exercise of all the precautions therein prescribed. (*Georgia v. Williams*, 74 Ga. 723; *Lake Shore v. Ward*, 135 Ill. 511, 26 N. E. 520.) The fallaciousness and unfairness of any such doctrine ought to be apparent on a moment's reflection. The effect of it is that, the more cautious and careful a man is in the adoption of rules in the management of his business in order to protect others, the worse he is off, and the higher the degree of care he is bound to exercise. A person may, out of abundant caution, adopt rules requiring of his employees a much higher degree of care than the law imposes. This is a practice that ought to be encouraged, and not discouraged. But, if the adoption of such a course is to be used against him as an admission, he would naturally find it to his interest not to adopt any rules at all." (p. 449.)

In the case of *Bush v. Railroad Co.*, 62 Kan. 709, 64 Pac. 624, it was said:

"The rules put in operation from time to time by a railroad company regulating the speed of its trains, the distance each shall run or the time or distance such trains shall remain apart are mere conveniences better to enable such company systematically to carry on its business, and are not intended to be a warning or notice to the public that trains will not be run except on schedule time." (p. 713.)

The rules admitted in evidence in this case were not adopted merely for the better and more systematic conduct of the defendant's business, but were intended, in part at least, if not entirely, for the protection of the public. The distinction between the two kinds of rules is obvious. The Bush case is improperly classified with the Fonda case in the L. R. A. note referred to above.

Rules of the kind under consideration are not admitted as legal standards of duty, but as some evidence of the measure

of caution which ought to be exercised in situations to which the rules apply. This limitation on the evidential value of the rules read to the jury was sufficiently stated, although not as plainly as might be desired, in the instruction quoted above.

The foregoing disposes of the principal assignments of error. Other criticisms of the proceedings are not deemed to be well founded.

The judgment of the district court is affirmed.